IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Richard Lance Williams, | : | |
| Plaintiff | : | Civil Action 2:11-cv-0822 |
| v. | : | Judge Watson |
| Michael J. Astrue, Commissioner of Social Security, | : | Magistrate Judge Abel |
| | : | |
| Defendant | : | |
| | : | |

**REPORT AND RECOMMENDATION**

Plaintiff Richard Lance Williams brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying his applications for Social Security disability insurance and Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the administrative record and the parties' merits briefs.

**<u>Summary of Issues.</u>** Plaintiff Williams maintains he has been disabled since October 2006, when he was 37 years old, by diabetes and diabetic neuropathy. He was 40 years old at the time of the administrative hearing. The administrative law judge ("ALJ") found that Williams retained the ability to perform jobs having medium exertional demands.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because the ALJ

- failed to follow the treating physician rule;
- failed to properly evaluate plaintiff's credibility; and
- relied on flawed vocational expert testimony.

**Procedural History.** Plaintiff Richard Lance Williams filed his applications for disability insurance and supplemental security income benefits on November 9, 2006, alleging that he became disabled on October 2, 2006, at age 37, by diabetes and diabetic neuropathy. (R. 157-62; 163-65; and 176-77.) The applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. On June 8, 2010, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified. (R. 77-118.) A vocational expert and a medical expert also testified. On August 19, 2010, the ALJ issued a decision finding that plaintiff Williams was not disabled within the meaning of the Act. (R. 8-19.) On July 20, 2011, the Appeals Council denied plaintiff's request for review and adopted the ALJ's decision as the final decision of the Commissioner of Social Security. (R. 1-4.)

**Age, Education, and Work Experience.** Richard Lance Williams was born July 8, 1969. (R. 83.) He has a high school education and two years of college. *Id.* From 1992 to 2004, Williams performed clerical work for a title company, traveling the state to close loans. He last worked in 2010 until February 2011 as a loan closer, but he earned less than $300 a month. (R. 94-96.)

2

**<u>Plaintiff's Testimony</u>.** The administrative law judge fairly summarized

Williams's testimony as follows:

> The claimant testified that he cannot work due to his pain and that he has problems with loss of balance, dizziness or faints if he exerts energy or moves. He indicated for example walking, standing for periods of time or "any sort of movement whatsoever." The episodes last up to about five minutes and he says that he has lost consciousness three to four times a year. He also has diabetes, episodes of tachycardia, high cholesterol and sleep apnea. Further, he indicated that he had rotator cuff injuries on both shoulders, but has had no surgical intervention. X-rays of the claimant's right shoulder were normal (Exhibit 5F, p. 28). He had gone to physical therapy "off and on" for six years and his left shoulder was worse than his right \. He has sleep apnea and uses continuous positive airway pressure ("C-PAP") therapy. He said he had not noticed much improvement, then admitted to "maybe a little bit." He has had no psychiatric treatments, no psychiatric hospitalizations and no mental health care.
>
> He takes the medications as listed in Exhibit 17E. He reports side effects of his medications as problems with clarity of thought, dizziness and fatigue. He estimated that he could walk about five minutes and stand for 20-30 minutes at a time and for a total of four hours in an eight-hour day. He can sit for 20-30 minutes at a time and for a total of four hours in an eight-hour day. He thinks he can lift a gallon of milk, but is not sure because he does not try to lift.
>
> He lives in a two-story home with his mother. He estimated that he used the stairs 20-30 times a day. He is able to drive, but his license is currently suspended for a driving under the influence ("DUI") charge the weekend before the hearing.[1] He could drive daily to take his mother to and from work, as well as errands, and to visit family. He flew to Florida earlier this

---

[1]This was Williams's third DUI conviction. (R. 85-86.) Williams mostly told physicians that he was a light or moderate drinker. He told Dr. Robert Bahnson in March 2008 that his "social history is negative . . . for . . . alcohol consumption." Doc. 8-8, PAGEID # 504. Similarly, Dr. Parikh's office notes for March 12, 2009 state that Williams does not use alcohol. (R. 487 and 556.) In July 2008, Williams sought emergency room treatment after drinking approximately two glasses of wine and then feeling light-headed. His blood alcohol was .044. A drug screen was positive for marijuana. He said he was an occasional marijuana user. (R. 387-88.)

year and stayed for four days.

He stated that he did not smoke, he stopped nine or 10 years ago; however, notes in October 2009 shows the claimant planning to quit and only smoking three to four cigarettes a week (see Exhibit 14F, p. 12). He admitted to drinking socially and estimated that he drank four to eight beers a month and may drink more during football season. He also admitted to smoking marijuana about two or three times a year, the last time being about three months ago. He has been doing this for about the last six years.

On a typical day, he gets up around 7:30 a.m. and eats. Prior to his DUI charge, he would drive his mother to work, then go back to bed when he got home. He would sleep until about 4:00 p.m. He would pick his mother up, eat and then stay awake for three to five hours. He would go to bed between 9:00 and 11:00 p.m. and sleep 14 to 16 hours a day. He feels that he sleeps a lot because of the medication and the sleep apnea.

He states that he does not cook, clean or do any household chores because his mother does it all. Then he stated that "I do what I can. I will try to help. I will put dishes in the dishwasher." When he is awake he watches television or get on the internet for up to an hour. He may go to the store with his mother. He stated that he had a large family that he goes to the family functions such as birthdays and "stuff like that."

He reports that typically his blood sugar runs high and he does take insulin. He described constant pain and stabbing feelings all over his whole body and tingling in my hands. He spends most of the day lying down and when he sits he elevates his legs. He noted that he has no sources of income. His mother supports him and he receives Medicaid benefits, food stamps and welfare benefits. He  reported last working in February 2010. He said he worked a "little here and there" all along. He worked as a loan closer and a notary public approximately 10 hours a month; however, no self-employment earnings were posted to his account.

(R. 16-17.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets

out the relevant medical evidence of record.  This report and recommendation will not

4

summarize the record except insofar as it is relevant to plaintiff's assignment of errors. Essentially, plaintiff argues that the ALJ should have accepted the opinions of Dr. Sheri Hart, Williams's treating neurologist at the Ohio State University Hospitals, and found him disabled. This report will, therefore, summarize Dr. Hart's treatment notes and residual functional capacity evaluation, as well as other reports from treators at the OSU Hospitals.

### Physical Impairments.

On May 11, 2006, Dr. Raheela Khawaja, an endocrinologist, wrote Williams's family practitioner Dr. Thomas J. Trump, that plaintiff's blood sugars "improved tremendously" on insulin. They had gone from the 400 to 300 range to the 140 to 180 range. He complained of "neuropathy, blurry vision off and on . . . ." (R. 294.) For the past three years, his muscles and joints have ached. He had burning and hot and cold sensation in his feet as well as burning in his legs and scrotal area. Williams also complained of easy fatigue and weight loss. *Id.* He was taking Percocet, 325 mg, two times a day. He denied alcohol or tobacco abuse. (R. 295.)

Dr. Khawaja believed his pain was related to neuropathy. But neuropathy did not explain the muscle aches. Dr. Khawaja referred Williams to a neurologist to evaluate his neuropathy. She also advised him to wean himself off Percocet. *Id.*

Dr. Sheri Hart, a neurologist, first saw Williams on July 14, 2006 at the request of Dr. Khawaja. Williams reported burning dysesthesias of the feet, stabbing pain through-

5

out his body, and orthostasis (chronic dizziness). He was first diagnosed with diabetes about eight years before. He had poor diabetic control during that time. About three years before, he had the onset of burning dysthesias in his feet. About two years before, he began experiencing stabbing pain in different parts of his body. Over the past three months, his symptoms had become more intense. The symptoms started in his legs and progressed up his abdomen and chest. (R. 266.)

Williams had weight loss and was depressed. He appeared to be in some amount of distress and was anxious. His visual fields were full. He had normal muscle strength, movement and bulk. Dr. Hart found decreased temperature sensation in the feet and absent reflexes in the bilateral biceps, brachioradialis, patellas, and ankles. His pain, touch and vibration were intact in all four extremities. His gait was normal, and he could perform a heel, toe and tandem walk. Dr. Hart diagnosed small fiber neuropathy associated with diabetes and recommended a further work-up to rule-out other causes of the neuropathy. She wanted to evaluate his medications to determine their effect on his pain and somnolence. (R. 267.)

On October 20, 2006, Dr. Hart wrote Dr. Thomas J. Trump that she had seen Williams for a followup examination the day before. Williams reported continuing significant burning dysesthesias and right shoulder pain. Since going off Elavil, he felt significantly less fatigue. She prescribed Cymbalta in an attempt to better control his dysesthesias. (R. 265.)

On November 13, 2006, Dr. Khawaja wrote to Dr. Trump that she saw Williams

6

that day for a followup examination. Williams had a seven year history of diabetes. Tests were consistent with a diagnosis of type 1 diabetes. He did not bring his blood glucose numbers but said they were variable. He did not have episodes of hypogly-cemia. His burning sensation in the feet was better. His dizziness spells were much better. (R. 292.)

On examination, Williams looked healthy. His skin was normal except for some rash on the plantar aspect of the right foot. There were no carotid bruits. He did have decreased sensation with monofilament testing. Dr. Khawaja asked Williams to send her his blood glucose numbers within a week so that his insulin dose could be further adjusted. *Id.* The doctor prescribed a low dose of ACE inhibitor to prevent neuropathy. Dr. Khawaja noted that Williams was given samples of his medications as it was be-coming a hardship for him to afford treatment. (R. 293.)

On January 9, 2007, Dr. Hart  reported to the Social Security Administration that Williams suffered from painful neuropathy and decreased reflexes. His gait was norm-al, and he did not require ambulatory aids. He could perform fine and gross manipula-tions. These findings had persisted three years despite therapy. The intensity and per-sistence of the symptoms and pain were consistent with the physical findings. (R. 264.)

On February 4, 2007, Dr. Anton Freihofner reviewed the medical evidence for the Commissioner and executed a residual functional capacity questionnaire. He found that Williams could occasionally lift and/or carry up to 50 pounds and frequently lift and/or carry up to 25 pounds. He could both walk and/or stand and sit for about 6 hours

7

during an 8-hour work day. Dr. Freihofner noted that during an October 6 office visit Williams said he felt significantly less fatigued. His diabetes was "currently being controlled with medications. Blood sugars had improved tremendously." He had no hospitalizations related to diabetes. (R. 300.)

On March 29, 2007, Williams underwent a Quantitative Sudomotor Axon Reflex Test ("QSART") that was consistent with small fiber neuropathy. (R. 539.) A tilt table test revealed findings consistent with grade I, *i.e.,* mild, orthostatic intolerance with vasovagal reactivity. (R. 540-541.)

On April 23, 2007, Dr. Hart wrote Dr. Trump that she saw Williams for a follow-up examination three days before for his ongoing near syncope and dysesthesias. She said the QSART was positive for small-fiber neuropathy. Tilt table testing was positive for mild orthostatic intolerance. Williams had ongoing dysesthesias. She recommended that Williams see a pain management specialist. Dr. Hart also advised Williams to elevate his head at night and decrease his salt intake. He chose to begin beta blocker treatment for his syncope.(R. 338.)

The April 9, 2007 office notes of Dr. Thomas Trump, Williams's treating family practitioner, indicate plaintiff had right shoulder pain of close to nine months duration. He diagnosed rotator cuff tendinitis, bursitis. (R. 312.)

On June 4, 2007, Dr. Khawaja answered a questionnaire regarding Williams's diabetes. He had no frequent and severe hypoglycemic reactions. There was decreased monofilament sensation in his feet and reduced reflexes in his ankles. Williams re-

8

ported significant pain and burning in his legs, chest and abdomen. He did not require ambulatory aids. (R. 308.) Williams's weight had increased from 168.4 pounds in May 2006 to 206 pounds in May 2007. (R. 309.)

On June 18, 2007, Dr. Sudhir Dubey, a psychologist, performed a disability examination and evaluation of Williams. Plaintiff was living alone in a home he owned. He relied on gifts and state health care assistance for his financial support. He denied both current and past substance abuse. (R. 365.) He had two DUI convictions two and a half years before. (R. 366.) His daily activities included watching television, computer work, staying home, and sleeping a lot. He tried to read but was unable to finish a book. His abilities to drive, shop, make purchases, and manage money were not affected. (R. 367.) Dr. Dubey concluded that Williams's ability to relate to coworkers and supervisors was not impaired. He had the ability to understand, remember and follow instructions. His ability to maintain attention, concentration, persistence and pact to perform simple repetitive tasks is mildly impaired. (R. 368.) He could withstand the stress and pressure associated with day-to-day work activity was not impaired. (R. 369.)

On August 3, 2007, Dr. Hart wrote to Dr. Trump that since his last visit Williams had been less symptomatic. However, he said that he got light headed mowing the grass and, although he would like to work out, was afraid strenuous activity would precipitate his feeling of presyncope. He was counseled about the need to hydrate and the effect of consuming large amounts of caffeine. Williams was to engage on a slow course of rehydration and reconditioning. He was scheduled to return in six months. (R.

9

471.)

Dr. Samir Parikh began treating Williams on December 19, 2007. (R. 500.) Williams said he was not feeling well and was observed to be diaphoretic and somewhat somnolent when he arrived. His blood sugar was 79. He quickly became more alert after being given some IV fluids and orange juice. The doctor discovered that two hours before Williams had accidentally given himself 10U of insulin rather than 5U as directed. Williams said that since starting using an insulin pump two months before his insulin had been relatively well-controlled. He had gained 80 pounds over the past year and now weighed 234 pounds. Williams said he generally felt tired and drank at least a pot of coffee every day to keep himself going. Finally, Williams said he had recently injured his left shoulder, but it was now feeling better. (R. 501.) Dr. Parikh diagnosed Insulin dependent diabetes, peripheral neuropathy and orthostasis, and left shoulder injury. (R. 502.)

On July 5, 2008, Williams was seen in the emergency room for nausea and vomiting. (R. 453.) He was diagnosed with apparent diabetic ketoacidosis. (R. 455.) He stabilized after he was started on IV Insulin. (R. 463.) Williams was then admitted to the hospital and remained as an inpatient through July 8. (R. 535.) Four days later, Williams returned to the emergency room with complaints of lightheadedness after drinking approximately two glasses of wine. His blood sugars were normal. He appeared to be very fatigued, and his only other complaint was lightheadedness. (R. 387.)  A drug screen was positive for alcohol and marijuana. Orthostatics were normal. There was no

10

evidence of hypoglycemia. He was diagnosed with near syncope and discharged. (R. 388.)

On April 4, 2008, Dr. Christina Salazar treated Williams at OSU Hospitals. He had been in an auto accident a week before and was suffering from whiplash. (R. 543-44.)

On July 5, 2008, Williams was hospitalized with elevated blood sugars. He said that there had been a kink in his insulin pump that precipitated his symptoms. (R. 463.)

On July 22, 2008, Dr. Hart wrote to Williams's family practitioner that she saw his patient on July 18. Williams said that he continued to become lightheaded when he exercised. She increased beta blocker doses and continued him on Cymbalta and Lyrica for dysesthesias. (R. 474.)

On July 24, 2008, Dr. Christina M. Salazar saw Williams. (R. 495.) His blood sugars had been well-controlled since his emergency room visit earlier that month. He denied any symptoms associated with uncontrolled diabetes. He said he "feels quite well." (R. 496.) Williams did complain about left shoulder pain. He said that physical therapy last year had been very helpful. He had no radicular pain and no numbness or tingling in his fingers. On examination, there was a decreased range of motion, tender-necessary, crepitus and pain in the left shoulder. *Id.* The next day Williams was referred to physical therapy.

On December 4, 2008, Williams saw Dr. Parikh with complaints that after his Atenolol dose was doubled six months before he began experiencing fatigue and

11

increased malaise. He was sleeping up to 14 hours a day. (R. 491-492.) Dr. Parikh believed the fatigue was due to the increased dose of beta blocker. Williams had not experienced lightheadedness since his last visit. (R. 492.) On March 12, 2009, Williams said he was still sleeping 14 to 16 hours a day. He was chronically fatigued but did not fall asleep during activity. He reported no episodes of lightheadedness but said he was not very active for fear of syncope.(R. 486.) Dr. Parikh told Williams to stop taking his beta blocker and start Midodrine and wear compression stockings. (R. 487-489.) A sleep study performed on April 26, 2009 revealed moderate obstructive sleep apnea. (R. 420.)

On December 5, 2008, Williams was evaluated for physical therapy for his right shoulder. He began experiencing pain in the shoulder about two years before. He was initially injured throwing a football. (R. 489-90.) His personal goals were "to be able to get back to playing some basketball and doing a lifting program anywhere from 2-3 times a week." The assessment was that Williams demonstrated a "fair-to-good re-habilitation potential." (R. 490.) A physical therapy plan was established. (R. 491.) However, in March 2009 Williams was terminated from physical therapy after attending just four sessions. (R. 407.)

On March 10, 2009, Williams saw Dr. Parikh for sleep problems, syncope and diabetes. His chief complaints were fatigue and hypersomnia. (R. 555.) Dr. Parikh said that Williams's hypersomnia was chronologically correlated with beta blockers. The plan was to stop using the beta blockeres and to refer plaintiff for a sleep evaluation. (R. 557.)

12

On June 5, 2009, Dr. Khawaja wrote to Dr. Trump that Williams gets tired and has sustained erection problems. His morning blood glucoses were more than 150. He was unable to give her blood glucose numbers for the rest of the day. His weight was 236 pounds. His blood glucose that day was 276. On examination, Williams had "decreased monofilament." Dr. Khawaja increased Williams's insulin. (R. 475.)

On July 23, 2009, Dr. Hart wrote that in the interim since she last saw Williams "he is happy with the control of his symptoms." He still experienced "exercise intolerance, but not as much with biking." He had gained weight, and Dr. Hart advised him to stop eating when he is not hungry. She also advised him "to stay as active as possible with non-gravity related exercises." Since Williams was happy with his symptom control, there was no reason for him to return to Hart for treatment unless something changed. (R. 530.)

On August 12, 2009, Williams saw Dr. Leroy Essig and complained of profound fatigue and daytime sleepiness and feeling unrefreshed even after sleeping 12 to 14 hours at night. Dr. Essig suspected that obstructive sleep apnea was causing Williams's hypersomnia. He recommended that he have a sleep study with use of a CPAP. (R. 484.)

On October 5, 2009, Williams told Dr. Salazar his hypersomnia was unchanged. He had not experienced hypoglycemia.  (R. 551.) He was to restart physical therapy for this right shoulder pain. His diabetes was said to be uncontrolled. His vasodepressor syncope was somewhat controlled. (R. 553.)

In a letter dated November 23, 2009, Dr. Hart reported she was treating Williams

for small fiber neuropathy and subsequent dysautonomia secondary to diabetes. She said the small fiber neuropathy was documented by QSART. Dr. Hart believed Williams was limited in his daily activities by pain and lightheadedness related to his neuropathy and said that it was unlikely he would ever recover. (R. 582.)

Dr. Hart completed a Diabetes Mellitus Impairment Questionnaire dated November 23, 2009 (R. 575-580.) Dr. Hart reported that she was treating Mr. Williams' yearly at that time and had seen him most recently in July 2009. Her diagnosis was poorly controlled diabetes. (R. 575.) Clinical findings included extremity pain and numbness and dizziness/loss of balance. (R. 575-576.) QSART testing supported her diagnosis of small fiber neuropathy. Mr. Williams' primary symptoms were pain, syncope, and lightheadedness. (R. 576.) Dr. Hart gave the opinion that Williams was able to sit 4 hours total and stand/walk 2 hours total in an 8-hour workday. He could occasionally lift up to 10 pounds, but was unable to carry any weight. (R. 578.) Dr. Hart opined that Mr. Williams would be absent from work, on the average, two to three times a month as a result of his impairments or treatment. He was also limited by syncope episodes. Dr. Hart stated that the symptoms and limitations described in the questionnaire were present since 2004. (R. 580.)

In May 2010, Williams underwent overnight polysomnography, which found moderate obstructive sleep apnea. The sleep apnea was "abolished with CPRAP of 7 cm water pressure." (R. 630.) Williams was to begin using a CPRAP machine. He was also encouraged to lose weight. *Id.*

14

**Administrative Law Judge's Findings.**

The ALJ found that Williams's severe impairments were dysesthesias and small fiber neuropathy secondary to insulin dependent diabetes mellitus; hypertension; hyperlipidemia; right shoulder pain; and moderate obstructive sleep apnea. (R. 14.) She found that Williams retained the ability to perform a full range of medium work. (R. 15.)

In making this determination, the ALJ found that plaintiff's subjective complaints of disabling symptoms were not supported by the record:

> The claimant's subjective complaints are not supported by nor are they consistent with the objective medical evidence. Although the medical evidence documents the existence of an impairment or impairments that could reasonably be expected to produce a certain degree of pain or other symptoms, the pivotal question is not whether such symptoms exist, but whether these symptoms occur with such frequency, duration, and/or severity as to reduce the claimant's residual functional capacity to what has been set forth above in the findings or is of such severity as to preclude any and all work activity on a continuing and regular basis.
>
> The claimant in this case does not have an underlying medically determinable impairment that could reasonably cause the type of pain and symptomatology alleged. However, a careful review of the record does not disclose sufficient objective medical evidence to substantiate the severity of the symptoms and degree of functional limitations alleged by the claimant. The objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the range of work described above.
>
> [T]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the

15

above residual functional capacity assessment.

In addition to the general lack of objective evidence to support his subject complaints, there are other considerations that weigh against the claimant's overall credibility.

The claimant's daily activities, as described earlier in this decision, are not consistent with the level of persistence of symptoms alleged, and they are not credibly restricted to the extent that the claimant would be precluded from the range of work assessed herein.

Further, despite alleging significant shoulder pain, the record reflects that the claimant was discontinued from physical therapy due to lack of follow-up (Exhibit 10F, p. 6).

The record also contains inconsistent and exaggerated statements that further detract from the claimant's overall credibility. For example, the claimant was not entirely honest in regards to his alcohol and marijuana use. The record reflects that the claimant advised the consultative evaluator that he did not use or abuse any substances (Exhibit 6F, p.1). There are other records which show he reported occasional use and also denied use (see e.g. Exhibits 9F, p. 2 and 14F, p. 15).

Although the inconsistent/exaggerated information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless, such statements suggest that the information provided by the claimant generally may not be entirely reliable.

(R. 17-18.) The ALJ rejected the opinion of Dr. Hart that Williams was disabled:

As for the opinion evidence, the opinion of Dr. Hart as found at Exhibit 15F, has been considered and is given little weight. The opinion is not entirely supported by the objective evidence of record or even Dr. Hart's own treatment notes. In July 2009, Dr. Hart released the claimant after he indicated he was happy with the control of his symptoms, which is inconsistent with a finding of such restriction as found in that exhibit.

(R. 18.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings

16

of the Commissioner as to any fact, if supported by substantial evidence, shall be con-
clusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389,
401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is
"'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.
1976).  The Commissioner's findings of fact must be based upon the record as a whole.
*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366
(6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining
whether the Commissioner's decision is supported by substantial evidence, the Court
must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers
v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting
*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and
Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Plaintiff argues that the decision of the Commissioner
denying benefits should be reversed the ALJ

- failed to follow the treating physician rule;
- failed to properly evaluate plaintiff's credibility; and
- relied on flawed vocational expert testimony.

**Analysis.**

Treating Doctor: Legal Standard.  A treating doctor's opinion[2] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

---

[2]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.*, the error is *de minimus. Wilson,* 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1) (A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[3].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case

---

[3]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

19

record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medic-ally acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory find-ings and what they signify." *Id.* When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ." The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion. When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's [opinion] more weight than we would give it if it were from a non-treating source." 20

20

C.F.R. §404.1527(d)(2)(i).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

Adjudicators must remember that a finding that a treating source medical

opinion is not well-supported by medically acceptable clinical and lab-
oratory diagnostic techniques or is inconsistent with the other substantial
evidence in the case record means only that the opinion is not entitled to
"controlling weight," not that the opinion should be rejected. Treating
source medical opinions are still entitled to deference and must be weigh-
ed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927. In
many cases, a treating source's medical opinion will be entitled to the
greatest weight and should be adopted, even if it does not meet the test for
controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-

2p. A broad conclusory statement of a treating physician that his patient is disabled is

not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating

physician's opinion to have controlling weight it must have "sufficient data to support

the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th

Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may

reject the treating doctor's opinions when "good reasons are identified for not accepting

them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We

will always give good reasons in our notice of determination or decision for the weight

we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378

F.3d 541, 544 (6th Cir. 2004). Even when the Commissioner determines not to give a

treator's opinion controlling weight, the decision-maker must evaluate the treator's

opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson,* 378 F.3d at 544;

*Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable presump-

tion that the treating physician's opinion "is entitled to great deference." *Rogers v. Com-*

*missioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley,* above. The Com-

missioner makes the final decision on the ultimate issue of disability. *Warner v. Com-*

*missioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Serv-*

*ices,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services,*

801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker,*

667 F.2d 954, 958 n.1 (11th Cir. 1982).

<u>Treating Doctor: Discussion</u>. The ALJ found that Dr. Hart's opinion that Williams

could only work 6 hours a day, could occasionally lift, but not carry, up to 10 pounds,

and would be absent from work 2-3 times a month was not entirely credible. She con-

cluded that Dr. Hart's opinion was "not entirely supported by the objective evidence of

record or even Dr. Hart's own treatment notes." As an example, the ALJ noted that in

July 2009 Dr. Hart released Williams because he was happy with the control of his

symptoms. (R. 18.)

As the ALJ observed, Williams did frequently complain to his treators about

excessive sleeping and pain in his shoulders and feet. However, there is no objective

medical evidence supporting his statements about the intensity and persistence of his

symptoms. His gait is normal, and he is able to perform fine and gross manipulation.

(R. 264, 293.) Williams frequently  reported an improvement in some or all of his symp-

toms. (R. 292, 300, 471, 486, 492, 496, 530.) QSART testing was consistent with small

fiber neuropathy, and tilt table testing demonstrated mild orthostatic intolerance. (R.

539-41.) In February 2007, a physician reviewed the medical record and determined

Williams could occasionally lift and carry up to 50 pounds and stand/walk as well as sit for 6 hours each during an 8 hour work day. (R. 300.)

Given the relatively modest objective medical findings and the fact that no treating physician indicates in his or her office notes and letters to referring doctors that Williams is disabled and unable to perform any substantial gainful activity, the Magistrate Judge concludes that the ALJ did not err in refusing to fully credit Dr. Hart's opinion on the ultimate issue of disability.

Plaintiff's credibility. Plaintiff argues that the ALJ failed to properly evaluate Williams's credibility. Specifically, plaintiff argues that the ALJ conceded that his medically determinable impairments could be expected to cause his symptoms but found Williams's statements about the intensity, persistence and limiting effects of those symptoms was not entirely credible. However, plaintiff further argues, the ALJ's finding that unspecified "objective" evidence did not support Williams's testimony about the impact of his symptoms and her finding that his daily activities were inconsistent with his testimony about the limitations caused by his symptoms are not supported by substantial evidence and are contrary to law.

Pain is an elusive phenomena.  Ultimately, no one can say with absolute certainty whether another person's subjectively disabling pain and other symptoms preclude all substantial gainful employment.  The Social Security Act requires that the claimant establish that he is disabled.  Under the Act, a "disability" is defined as "inability to engage in any substantial gainful activity *by reason of any medically determinable or mental*

24

*impairment* which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A), subjective symptoms alone cannot prove disability. There must be objective medical evidence of an impairment that could reasonably be expected to produce disabling  pain or other symptoms :

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.  Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide a framework for evaluating a claimant's symptoms consistent with the commands of the statute:

> (a) *General*.  In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c).  By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e).  These include statements or reports from you, your treating or examining physician or psych-

ologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. §404.1529(a). A claimant's symptoms will not be found to affect his ability to work unless there is a medically determinable impairment that could reasonably be expected to produce them. 20 C.F.R. § 404.1529(b). If so, the Commissioner then evaluates the intensity and persistence of the claimant's pain and other symptoms and determines the extent to which they limit his ability to work. 20 C.F.R. § 404.1529(c). In making the determination, the Commissioner considers

all of the available evidence, including your history, the signs and labora-
tory findings, and statements from you, your treating or nontreating
source, or other persons about how your symptoms affect you. We also
consider the medical opinions of your treating source and other medical
opinions . . . .

*Id.*

In this evaluation of a claimant's symptoms, the Commissioner considers both

objective medical evidence and "any other information you may submit about your

symptoms." 20 C.F.R. § 404.1529(c)(2). The regulation further provides:

Because symptoms, such as pain, are subjective and difficult to quantify,
any symptom-related functional limitations and restrictions which you,
your treating or nontreating source, or other persons report, which can
reasonably be accepted as consistent with the objective medical evidence
and other evidence, will be taken into account as explained in paragraph
(c)(4) of this section in reaching a conclusion as to whether you are dis-
abled. We will consider all of the evidence presented, including informa-
tion about your prior work record, your statements about your symptoms,
evidence submitted by your treating or nontreating source, and observa-
tions by our employees and other persons. Section 404.1527 explains in
detail how we consider and weigh treating source and other medical
opinions about the nature and severity of your impairment(s) and any
related symptoms, such as pain. Factors relevant to your symptoms, such
as pain, which we will consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or
other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication
you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for
relief of your pain or other symptoms;

27

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). When determining the extent to which a claimant's symptoms limit his ability to work, the Commissioner considers whether the claimant's statements about the symptoms is supported by or inconsistent with other evidence of record:

In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).

SSR 96-7p explains the two-step process established by the Commissioner's regulations for evaluating a claimant's symptoms and their effects:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can

be shown by medically acceptable clinical and laboratory diagnostic tech-
niques--that could reasonably be expected to produce the individual's pain or
other symptoms. The finding that an individual's impairment(s) could reason-
ably be expected to produce the individual's pain or other symptoms does
not involve a determination as to the intensity, persistence, or functionally
limiting effects of the individual's symptoms. . . .

Second, once an underlying physical or mental impairment(s) that could
reasonably be expected to produce the individual's pain or other symptoms has
been shown, the adjudicator must evaluate the intensity, persistence, and
limiting effects of the individual's symptoms to determine the extent to which
the symptoms limit the individual's ability to do basic work activities. For this
purpose, whenever the individual's statements about the intensity, persistence,
or functionally limiting effects of pain or other symptoms are not substantiated
by objective medical evidence, the adjudicator must make a finding on the
credibility of the individual's statements based on a consideration of the entire
case record.

When additional information is needed to assess the credibility of the
individual's statements about symptoms and their effects, the adjudicator must
make every reasonable effort to obtain available information that could shed
light on the credibility of the individual's statements. In recognition of the fact
that an individual's symptoms can sometimes suggest a greater level of severity
of impairment than can be shown by the objective medical evidence alone, 20
C.F.R. § 404.1529(c) and 416.929(c) describe the kinds of evidence, including the
factors below, that the adjudicator must consider in addition to the objective
medical evidence when assessing the credibility of an individual's statements:

   1. The individual's daily activities;

   2. The location, duration, frequency, and intensity of the
   individual's pain or other symptoms;

   3. Factors that precipitate and aggravate the symptoms;

   4. The type, dosage, effectiveness, and side effects of any
   medication the individual takes or has taken to alleviate
   pain or other symptoms;

   5. Treatment, other than medication, the individual receives
    or has received for relief of pain or other symptoms;

29

6. Any measures other than treatment the individual uses
or has used to relieve pain or other symptoms (e.g. lying
flat on his or her back, standing for 15 to 20 minutes every
hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional
limitations and restrictions due to pain or other symptoms.

Case law interpreting the statute and regulations. At the outset, it is important to

keep in mind that symptoms are the claimant's "description of [his/her] physical or

mental impairment."  20 C.F.R. § 404.1528(a). Inevitably, evaluating symptoms involves

making credibility determinations about the reliability of the claimant's self-report of

his symptoms. *Smith ex rel E.S.D. v. Barnhart*, 157 Fed.Appx. 57, 62 (10th Cir. December.

5, 2005) (not published)("Credibility determinations concern statements about symp-

toms.")

"Where the symptoms and not the underlying condition form the basis of the

disability claim, a two-part analysis is used in evaluating complaints of disabling pain."

*Rogers v. Commissioner of Social Sec.,* 486 F.3d 234, 247 (2007); SSR 96-7p, 1996 WL 374186

(July 2, 1996). That test was first set out in *Duncan v. Secretary of Health and Human*

*Services*, 801 F.2d 847, 853 (6th Cir. 1986). First, the Court must determine "whether there

is objective medical evidence of an underlying medical condition."  If so, the Court must

then

examine:  (1) whether objective medical evidence confirms the
severity of the alleged pain arising from the condition; or (2)
whether the objectively established medical condition is of such a
severity that it can reasonably be expected to produce the alleged

30

disabling pain.

*Duncan*, 801 F.2d at 853.  Any "credibility determinations with respect to subjective complaints of pain rest with the ALJ."  *Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 247 (citing  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir.1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir.1981)).  The ALJ is required to explain her credibility determination in her decision, which "'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *See id.* (quoting SSR 96-7p).  Furthermore, the ALJ's decision must be support-ed by substantial evidence.  *Rogers*, 486 F.3d at 249.

    Discussion of ALJ's credibility determination. Although Williams told his treat-ors and testified that he slept 14-16 hours a day, he also worked part-time as a loan closer[4], drove his mother to and from work[5], he was able to fly to Florida to visit his ill father, he ran errands, visited friends, spent time on the internet, and watched tele-vision. He lived with his mother who performed most household chores, but Williams

---

[4]Based on his testimony that he worked approximately 10 hours a week, this work was not substantial gainful employment. As the ALJ pointed out, there are no independent records regarding the employment, since no self-employment earnings were posted to his Social Security account and he submitted no 1099s or pay stubs to the Commissioner.

[5]However, he could not drive at the time of the hearing before the ALJ because the week before he had his third DUI conviction.

31

conceded he did perform some household chores. Although he complained of pain, including pain in his right shoulder, he stopped physical therapy for the shoulder in 2009 after only four sessions. The ALJ also discounted plaintiff's veracity because he had provided inconsistent and exaggerated statements about his alcohol and marijuana use.

Ultimately, the adjudicator has to make a judgment about a witnesses's credibility. Sometimes that is difficult. Here Williams suffers from uncontrolled diabetes and sleep apnea. Objective medical evidence establishes that he has insulin dependent diabetes mellitus, hypertension, hyperlipidemia, right shoulder pain, and moderate obstructive sleep apnea. The sleep apnea can be remedied by a CPRAP machine. The hypertension and hyperlipidemia do not prevent Williams from working. The right should pain is not so severe that Williams would continue physical therapy. The diabetes has caused small fiber neuropathy in the lower extremities. There is no evidence that it has impaired plaintiff's gait, or prevented him from performing the necessary activities of daily living. These impairments certainly cause plaintiff difficulty, but the record does not demonstrate that Williams is unable to perform work having medium exertional demands. Nor does it sustain plaintiff's assertion that the ALJ erred in her assessment of his credibility and her determination that his symptoms do not prevent him from performing sustained substantial gainful activity.

Vocational expert's testimony. Plaintiff argues that the vocational expert's testimony was flawed because it was based on the ALJ's residual functional capacity

32

finding that Williams could perform a full range of medium work. "[T]he ALJ need only include the alleged limitations that the ALJ accepts as credible and that are supported by the evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F. 2d 1230, 1235 (6th Cir. 1993)." *Timothy Knight v. Commissioner of Social Security*, No. 03-1564 (6th Cir. January 12, 2005). Since there is substantial evidence supporting the ALJ's residual functional capacity findings, it was not error for her to rely on the vocational expert's testimony based on those findings.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v.*

*Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

 s/Mark R.  Abel
United States Magistrate Judge